IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SHANNON L.[1],

    Plaintiff,

v.

ANDREW SAUL,
Commissioner of Social Security,

    Defendant.

_____

Civ. No. 1:18-cv-2075-MC

OPINION AND ORDER

MCSHANE, Judge:

    Plaintiff brings this action for judicial review of the Commissioner's decision denying her application for supplemental security income and disability insurance benefits. This court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3). On February 18, 2015, Plaintiff filed an application for benefits, alleging disability as of September 1, 2013. Tr. 15.[2] After a hearing, the administrative law judge (ALJ) determined Plaintiff was not disabled under the Social Security Act. Tr. 15-23. Plaintiff argues the ALJ erred in finding her not credible and in rejecting the opinion of her treating physician assistant (PA). The Court agrees. Because the ALJ's decision is filled with errors, and because the record reveals Plaintiff is disabled under the Act, the Commissioner's decision is REVERSED and this matter is remanded for an award of benefits.

---

[1] In the interest of privacy, this Opinion and Order uses only the first name and the initial of the last name of the non-governmental party in the case.
[2] "Tr" refers to the Transcript of Social Security Administrative Record provided by the Commissioner.

1 – OPINION AND ORDER

## STANDARD OF REVIEW

The reviewing court shall affirm the Commissioner's decision if the decision is based on proper legal standards and the legal findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012) (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)). To determine whether substantial evidence exists, we review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion. *Davis v. Heckler*, 868 F.2d 323, 326 (9th Cir. 1989). "If the evidence can reasonably support either affirming or reversing, 'the reviewing court may not substitute its judgment' for that of the Commissioner." *Gutierrez v. Comm'r of Soc. Sec. Admin.*, 740 F.3d 519, 523 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 720-21 (9th Cir. 1996)).

## DISCUSSION

The Social Security Administration utilizes a five-step sequential evaluation to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520 & 416.920 (2012). The initial burden of proof rests upon the claimant to meet the first four steps. If the claimant satisfies his burden with respect to the first four steps, the burden shifts to the Commissioner for step five. 20 C.F.R. § 404.1520. At step five, the Commissioner must show that the claimant is capable of making an adjustment to other work after considering the claimant's residual functional capacity (RFC), age, education, and work experience. *Id*. If the Commissioner fails to meet this burden, then the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v); 416.920(a)(4)(v). If, however, the Commissioner proves that the claimant is able to perform other work existing in significant

numbers in the national economy, the claimant is not disabled. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001).

The ALJ concluded Plaintiff suffered from the following severe impairments: diabetic polyneuropathy, chronic regional pain syndrome (CRPS), obesity,[3] and a history of meniscus tear in her right knee. Tr. 18. The ALJ determined that despite those impairments, Plaintiff had the RFC to perform light work. Tr. 18. Based on that RFC, the ALJ determined at Step four that Plaintiff could perform her past relevant work as a preschool teacher and teacher aide. Tr. 22. In making that determination, the ALJ found Plaintiff was not credible as to the extent of her limitations. Tr. 19-22. Intertwined with that determination is the ALJ's weighing of the medical opinions. Specifically, the ALJ gave great weight to the opinions of the state agency consultants who in turn largely relied on the opinion of Mike Henderson, M.D. In May 2015 Dr. Henderson performed a comprehensive neurologic exam of Plaintiff. Tr. 22. In contrast, the ALJ gave little weight to the opinion of Terry Jones, PA. For eight years, Jones served as Plaintiff's primary care provider.[4] As discussed below, the ALJ erred in relying on isolated instances of evidence that are not supported by the record as a whole, and in failing to consider the implications of Plaintiff's CRPS with regard to Plaintiff's credibility and with regard to the weight of the medical opinion. The Court notes that this is not a particularly close question. Any objective review of the entire medical record leads to the conclusion that Plaintiff is clearly disabled under the Act.

From 2008 to 2013, Plaintiff worked part-time as a preschool and kindergarten teacher at a church. Tr. 36. In 2013, Plaintiff quit when pain from neuropathy made the work intolerable.

---

[3] Plaintiff is 5 feet 7 inches and weighed 300 pounds at the time of her application. Tr. 177.
[4] At the hearing, Plaintiff stated she sees a PA rather than a physician because "that's what I'm allowed to see under my medical insurance. That's who they allow me to see. . . . If there's a bigger issue, then I go to a specialist, like Dr. Ali, or I go get physical therapy at a hospital." Tr. 40.

Tr. 37. "I was having a lot of pain with pins, needles, pressure, pain due to my neuropathy." Tr. 41. In 2016, Plaintiff returned to work part time. As Plaintiff explained at the hearing:

> It was neuropathy. My neuropathy is—was coming on and I couldn't maintain a schedule, so I stopped. I applied for Social Security. I was denied. My doctor suggested I try part time work, that's why I tried part time work and then the CRPS came on and I could not continue in December. I had to stop, that was over a year ago. . . . I could not do the job anymore. I could not have children around my feet, so they graciously appreciated my efforts to come back, but I ultimately could not follow through the rest of the year. . . . Here's what happened. As soon as I tried to go back to work, I had an injury. I dropped a roll of paper, a large roll of paper on my foot and it injured my toe. That was as soon as I had started in the summer. By December, there was something very strange going on. I was in a pain situation I could not get out and that's when I found out that I had CRPS. So by going back to work and trying, I was injured and I kept trying for the next several months to work out and do what I could, but I could no longer do it and then I was diagnosed with CRPS in I think December or January.

Tr. 37-39.

Plaintiff testified that she could not currently work even if the job required no standing. "Because I can't stay in one position for very long. If I'm sitting, I have to keep my feet up. If I'm standing, I can only stand for a little while, I have to sit back down. I can't walk around for very long. I can't just do basic things anymore. The CRPS has really taken the last amount of ability that I had when I first got neuropathy." Tr. 39. Plaintiff stated that even when sitting, she often has to elevate her legs. Tr. 42. Due to pain in her feet, Plaintiff wears slip-ons and cannot wear normal shoes. Tr. 42. Plaintiff's CRPS mainly impacts her left foot, where she feels "Pressure, stabbing, crushing like there's something sitting on my foot all the time that never ever stops." Tr. 42-43. Plaintiff needs a cane to steady herself. Tr. 44.

In finding Plaintiff less-than fully credible as to her limitations, the ALJ noted:

> Overall, the evidence does not demonstrate that the claimant's symptoms preclude her from performing work related activity with the limitations set forth in the residual functional capacity above. She testified that she is unable to stand or walk for even short periods without using a cane but physical therapy progress notes of November 2017 contradict her testimony. However, the physical examinations show that she is able to ambulate without an assistive device and she has full

motor strength of the lower extremities. Nevertheless, I have considered her complaints and incorporated postural and environmental limitations giving her full benefit of any doubt regarding her complaints. While I find that her symptoms might have limited her functional capacity to some degree, her allegations are not consistent with the evidence to the extent that her capacity is so limited she is precluded from performing her past work as a preschool teacher or teacher's aide.

Tr. 22 (internal citation omitted).

The ALJ noted Plaintiff's testimony regarding the need of an assistance device is contradicted by November 2017 physical therapy notes. This greatly overstates Plaintiff's "progress" during physical therapy. Plaintiff first attended physical therapy in January 2017. Tr. 596. At that time, she reported falling twice in the past month due to a lack of balance. Plaintiff was unable to stand for more than seven minutes and unable to sit for longer than 10 minutes without the need to elevate her feet. Tr. 597. She could not tolerate wearing socks, let alone shoes. When asked what goal she hoped to attain from physical therapy, Plaintiff responded "Answers as to why my left foot is so bad, to gain back movement." Tr. 597. The physical therapist noted Plaintiff was "unable to touch carpet within treatment room with bare feet due to increased pain." "Based upon the 'Budapest criteria', Shannon demonstrates signs/symptoms of complex regional pain syndrome which includes sensory, vasomotor, edema, and motor/tropic changes. She demonstrates allodynia, increased temperature in her involved extremity, increased edema in her involved extremity and motor dysfunction in her involved extremity." Tr. 598. The therapist noted:

> Plan to include therapeutic exercises to address deficits in [range of motion], strength and functional activity limitations. Manual therapy techniques will be administered to address pain management, edema, [range of motion] and joint restrictions. Modalities will be applied to relieve pain, decrease edema, aide in healing, and/or to increase functional abilities.

Tr. 598.

By July 2017, Plaintiff's physical therapist noted Plaintiff still suffered from "Chronic pain with high reactivity." Tr. 646. She still experienced more pain than indicated merely by objective findings; i.e., "Allodynia and heperalgesia w/ suggestion of general central sensitization as evidenced w/ filament testing and pain pressure thresholds respectively."[5] Tr. 646. Her therapist noted "There are significant impairments and dysfunctions including loss of motion, strength, balance, endurance, and function. Presents w/ significant reported disability, near bedridden status. Psychosocial overlay is present with signs and declarations of depression and anxiety that may be influencing pain perceptions. There is also an admitted sense of learned helplessness that is confirmed with a significantly low level of pain self-efficacy. She has a fair prognosis." Tr. 646. "Pain significantly limits participation in therapy," Tr. 648, and the therapist deferred many tests due to hypersensitivity, Tr. 659. At this time, Plaintiff was unable to perform heel raises. Tr. 659.

Plaintiff returned to physical therapy in September 2017, ready to "initiate therapy stating she is ready and no longer grieving after the loss of her husband." Tr. 656. Plaintiff suffered throbbing pain in her foot and complained her foot felt like it "does not belong to her." Tr. 656. The therapist reported "Pain is significant!" Tr. 656. The ALJ was correct to note Plaintiff made progress, but failed to put that progress in perspective, especially in relation to the baseline level Plaintiff started physical therapy from. For instance, in September, Plaintiff made "progress" in the form of an improved gait pattern and that she was now able to go from sit to standing position five times. Tr. 656. Although Plaintiff made "progress," she still had not met her first physical therapy goals of being able to stand on the carpet without shoes or socks or doing more than five squats with equal weight distribution. Tr. 656.

---

[5] As described below, it is perfectly normal for a person diagnosed with CRPS to experience pain that, absent CRPS, would be considered to be out of proportion to any objective findings. Indeed, that is the very nature of CRPS.

In October, Plaintiff continued to make progress, but experienced increased pain with the increased movement. Tr. 662. "There is no change in the pain, and her (L) ankle/foot still do not feel like it is a part of her body." Tr. 662. Even with this progress, Plaintiff was rather limited. "Progress" in this sense was merely being able to complete two laps walking forward in bars, utilizing her upper extremities for support, and walking 250 feet (with the assistance of walking sticks) out to her car. Tr. 663. For the first time, on the last day of October 2017, Plaintiff met a PT progress goal. Tr. 696. This goal was merely to "progress to standing on carpet without shoes/socks." She continued to work towards each of her other PT goals. Despite making progress, the goal for the next session was simply to be "able to transfer from sitting to supine without assistance for left extremity motion." Tr. 664.

In November 2017—the month the ALJ pointed to in finding Plaintiff not credible—Plaintiff "Reports increasing sensitivity and pain into the ankle." Tr. 681. Objective notes indicate that Plaintiff "demonstrate[ed] guarded trunk with minimal step-through pattern and inconsistent step length w/ (R) LE during stance phase on (L). Persistent minimal toe off (L)." Tr. 681. Plaintiff could now complete three laps walking in the bars, although she still required support from her upper extremities. Tr. 681. Her therapist wrote, "PT continued to observe approximately 50% recruitment in (L) ankle/foot compared to (R) and significant hypersensitivity noted with light touch." Although Plaintiff was making improvement, she was still using a harness to limit weight bearing during physical therapy sessions. Tr. 681 (noting Plaintiff used "Solo-Step and Bioldex"). Later that month, Plaintiff still needed to use her arms for support and stability when walking in the bars. Tr. 688. The therapist noted Plaintiff "has been trying to walk more. Increased numbness in foot with prolonged walking (~75')."

Sometimes the numbness turns into a feeling like the foot is being crushed. There is still no change in foot/toe pain." Tr. 695.

The ALJ concluded that "She testified that she is unable to stand or walk for even short periods without using a cane but physical therapy progress notes of November 2017 contradict her testimony." Tr. 22. The ALJ's finding, however, is directly contradicted by physical therapy notes from November 2017. As detailed above, in November 2017, Plaintiff was still using her upper extremities for support and stability when walking in the bars. Tr. 688. Although Plaintiff was walking further in November 2017, this merely meant Plaintiff now walked approximately 75 feet at one time. Tr. 695. And as Plaintiff walked even this short distance, her pain increased. In fact, physical therapy notes indicate that it was only in November 2017 was Plaintiff "able to put her slippers on by herself now." Tr. 709. Rather than contradicting Plaintiff's testimony that she needs a cane to walk or stand for even a short time, notes from Plaintiff's final physical therapy session in November 2017 confirms that at that time, Plaintiff could stand for only 2-3 seconds on her right leg without utilizing upper extremity support. Tr. 717. Plaintiff's left leg was worse, and she could stand only one second on this leg without using her arms for support. Tr. 717. The ALJ failed to place Plaintiff's "progress" in context.

The ALJ also concluded Plaintiff's "function report indicates that she is capable of managing personal care, completing a variety of household chores, shopping in stores, driving, caring for others, and preparing simple meals in spite of her pain." Tr. 21. The ALJ overstated Plaintiff's activities of daily living.

In April 2015, Plaintiff filled out a function report. Regarding preparing meals, Plaintiff wrote that she does not spend more than 15 minutes making meals. Tr. 204. "I prepare more sandwiches for self and family because they are quick. I use crock pot because it is easy and I

can quickly toss ingredients in to cook all day for an evening meal." Although Plaintiff acknowledged doing some household chores, she explicitly wrote that these were small chores for only small periods of time. Tr. 205 (noting she will "spot sweep in small areas, fold clothes in small amounts."). Plaintiff stated that although she folds laundry, she does this chore while seated. Tr. 204. While Plaintiff acknowledged shopping for groceries once a week, she noted she accomplished this task only with the aid of a motorized cart. Tr. 206. Plaintiff explained that even with the cart, she had to finish in under an hour or her feet would start to burn. Tr. 206. And while Plaintiff cared for her children, her stated activities did not conflict with her alleged limitations. Her children were aged 12, 12, 13, and 17. Plaintiff woke them up for school and noted the children are in an "after school program so they can stay active." Tr. 203. Plaintiff wrote, "They have some issues due to being adopted and need a lot of emotional support, which I provide from my chair because my foot has to stay up." Tr. 203. None of these activities indicate Plaintiff could sustain full-time employment. *See Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (activities that lack a "meaningful relationship to the activities of the workplace" do not support an adverse credibility finding). And none of the activities—including providing emotional support (from a chair) for adolescent children—are inconsistent with Plaintiff's alleged limitations.[6]

Plaintiff's daughter submitted a third-party function report. Tr. 210. That report generally mirrors Plaintiff's own. Rather than alleging Plaintiff was completely bedridden, Plaintiff's daughter noted Plaintiff made very light meals and performs "short increments of light house keeping." Tr. 211. With respect to all of Plaintiff's activities, her daughter clearly noted Plaintiff

---

[6] If anything, Plaintiff's functional report is consistent with the record as a whole. For example, Plaintiff wrote in April 2015 that she could walk perhaps 70 feet before needing to rest. Tr. 207. Two years later, Plaintiff's physical therapist noted that although Plaintiff recently progressed to walking approximately 75 feet at one time, this came with an increase in pain. Tr. 695.

only performed the activities "Pain Level permitting." Tr. 211 (emphasis in original). The ALJ largely ignored this function report. In doing so, the ALJ concluded:

> The accuracy of the conclusions made by third-party sources is questionable because they are not medically trained to make exacting observations as to dates, frequencies, types, and degrees of medical signs and symptoms, or of the frequency or intensity of unusual moods or mannerisms. Moreover, by virtue of the relationship with the claimant, they cannot be considered a disinterested third party witness whose reports of restriction in functioning would not tend to be discolored by affection for the claimant and a natural tendency to agree with the symptoms and limitations the claimant alleges.

Tr. 21.

The ALJ appears to believe that she need only consider opinions of medically trained individuals who lack any relation to the claimant. The regulations, however, clearly state that the ALJ must consider nonmedical "other source" opinions. 20 C.F.R. § 404.1529(c)(3). Contrary to the ALJ's conclusion, lay testimony need not be backed by any particular expertise in order to be entitled to consideration. *Molina v. Astrue*, 674 F.3d 1104, 1114 (9th Cir. 2012) ("Lay testimony as to claimant's symptoms or how an impairment affects the claimant's ability to work is competent evidence that the ALJ must take into account."). And the mere fact that Plaintiff's daughter was related to Plaintiff is not a germane reason to reject the daughter's report. *Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir. 1993) ("Although eyewitnesses have to rely to some extent on communications with the claimant in ascertaining whether she is disabled or malingering, we have held that friends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify as to her condition.").[7]

---

[7] The ALJ also appears to have held Plaintiff's unsuccessful work attempt against her. Tr. 17-18 (finding Plaintiff's unsuccessful attempt to return to work part time for five months in 2016 qualified as substantial gainful employment). As noted by Plaintiff, her earnings during this five month period did not rise to "substantial gainful activity." Pl.'s Opening Br. 18. "An ALJ may not rely upon an unsuccessful work attempt to find a claimant not credible. . . . In fact, an attempt to return to substantial gainful activity, rendered unsuccessful solely by the claimant's symptoms and limitations, strengthens a claimant's credibility. *See* [*Lingenfelter v. Astrue*, 504 F.3d 1028, 1038 (9th Cir. 2007)." *Jalexi O. v. Berryhill*, No. 6:17-cv-00172-MC, 2018 WL 4931996 at *8 (D. Or. 2018).

Where, as here, there is no evidence of malingering, the ALJ may only reject the claimant's testimony by offering clear and convincing reasons for doing so. *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008). The ALJ provided no legitimate reasons, let alone clear and convincing reasons, for finding Plaintiff not credible as to the extent of her limitations. The ALJ erred in cherry picking certain physical therapy notes referencing Plaintiff's "progress" and using those notes to find Plaintiff overstated her own limitations. *See Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014) (error to point to isolated instances of improvement in rejecting a claimant's testimony). This error was not harmless, and, as discussed below, appears to be intertwined with the ALJ's erroneous weighing of the medical evidence.

Terry Jones, PA, had an eight-year treating relationship as Plaintiff's primary care provider. Tr. 620. On June 30, 2017, Jones filled out a CRPS Medical Source Statement outlining his opinions as to Plaintiff's abilities. Tr. 620-23. Jones noted Plaintiff suffered from the following CRPS symptoms: increased sensitivity to touch; burning, aching or searing pain initially located to the site of injury; restricted mobility; and abnormal sensations of heat or cold. Tr. 620. Jones felt Plaintiff could stand between five and ten minutes before needing to sit or walk around. Tr. 621. In an eight-hour day, Plaintiff could stand/walk for less-than two hours and sit at least six hours. Plaintiff would need a job that allowed switching between standing and sitting, and would need to walk every hour for about three minutes. Due to muscle weakness and pain or numbness, Plaintiff would need hourly, unscheduled 15-minute breaks on an hourly basis. Tr. 621-22. Jones noted that due to left foot swelling, Plaintiff would need to elevate her legs above her head on an hourly basis and, when standing or walking, would need a walker. Tr. 622. Due to pain and side effects from medication, Plaintiff would be off task 25% or more of the workday. Tr. 623. Jones wrote that although Plaintiff had good and bad days, she "rarely"

had good days. Finally, Jones noted Plaintiff would miss more than four days every month and indicated his opinion reflected Plaintiff's symptoms and limitations from May 2015 on.

Recognizing the realities of today's healthcare, the agency issued guidance concerning "other source" opinions from those, like PAs, who are not "acceptable medical sources:"

> Information from these "other sources" cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an "acceptable medical source" for this purpose. However, information from such "other sources" may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.
>
> * * * *
>
> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.
>
> * * * *
>
> Although [the regulations] do not address explicitly how to evaluate evidence (including opinions) from "other sources," they do require consideration of such evidence when evaluating an "acceptable medical source's" opinion. For example, SSA's regulations include a provision that requires adjudicators to consider any other factors brought to our attention, or of which we are aware, which tend to support or contradict a medical opinion. Information, including opinions, from "other sources"—both medical sources and "non-medical sources"—can be important in this regard in addition, and as already noted, the Act requires us to consider all of the available evidence in this individual's case record in every case.

SSR 06-03P, available at 2006 WL 2329939 at **2-4.

As an "other source" opinion, the ALJ was required to provide germane reasons for rejecting Jones's opinion. *Molina*, 674 F.3d at 1111) (as physician's assistant is not an "accepted

medical source," ALJ must provide germane reasons to reject it). The ALJ gave little weight to Jones's opinion, stating:

> On December 18, 2017, in direct contrast to improvements made in physical therapy, the claimant reported to Terry Jones, physician's assistant (PA), that her CRPS was "out of control". During the first half of claimant's physical therapy sessions, her PA opined that the claimant would be able to sit for at least six hours and stand/walk less than two hours in an eight hour workday due to symptoms of CRPS. However, she must walk every hour for three minutes and take unscheduled 15 minute breaks on an hourly basis and she would miss more than four days of work per month. I accord little weight to this opinion, as it is wholly inconsistent with the evidence. The PA endorsed an eight-year treating relationship concluding that the claimant is extremely limited in functioning with the likelihood of multiple absences due to her symptoms. However, the PA did not have the benefit of reviewing the entire record including the claimant's physical therapy progress and her ability to return to work as a preschool teacher until she injured her foot.

Tr. 20-21 (internal citations omitted).

The ALJ failed to provide a germane reason for rejecting Jones's opinion. The Court previously outlined the ALJ's distortion of the record in pointing to Plaintiff's "progress" in physical therapy. In no way do the physical therapy notes clash with Plaintiff's December 2017 statement to Jones that her CRPS was "out of control." Contrary to the ALJ's finding, Jones's opinion was entirely consistent with the record as a whole.

The ALJ's finding that Jones was unaware of Plaintiff's "ability to return to work as a preschool teacher until she injured her foot" is contradicted by the treatment notes. In a June 29, 2017 treatment note, Jones noted Plaintiff "dropped a roll of bulletin board work paper on her forefoot approximately [one] year ago since then she has had nearly uncontrollable pain swelling trophic changes in the left foot [and] . . . she is not able to walk more than a few minutes in fact she walked with a walker she was a schoolteacher but is unable to continue her job." Tr. 388. As described above, Plaintiff dropped the roll of paper on her foot in July 2016, right at the start of her five-month, part-time, unsuccessful work attempt. In the "Plan" section of the June 29, Jones

13 – OPINION AND ORDER

wrote, "this is a pleasant female with multiple issues she has tried to continue working but her issues have made it impossible." Tr. 391.

The ALJ's decision to give no weight to Jones's opinion because he allegedly "did not have the benefit of reviewing the entire record" is not a germane reason, especially when juxtaposed against the ALJ's decision to give great weight to the opinion of the state reviewing physician. In contrast to Jones's eight-year treating history of Plaintiff, the reviewing doctor never laid eyes on Plaintiff. Additionally, the agency doctor provided his opinion on October 1, 2015, nearly two years before Jones provided his opinion. The reviewing doctor gave "full weight" to Dr. Henderson's opinion from May 2015. Tr. 75 (Dr. Henderson's "Opinion given full weight. She showed poor effort at this exam. Totality of evidence doesn't support the level of disability that clmt alleges.") Tr. 75.

The reviewing physician's opinion is understandable given that in October 2015, Plaintiff had yet to be diagnosed with CRPS. In early 2017, Jones suspected Plaintiff had CRPS and referred her to a neurologist. Tr. 412. On May 9, 2017, Plaintiff saw Zakir Ali, M.D. Tr. 382-83. Dr. Ali, a neurologist, diagnosed Plaintiff with CRPS and explained:[8]

> Shannon has diabetes and a baseline of diabetic neuropathy. She was a schoolteacher and had a roll of bulletin board paper fall on the left foot last year. Secondary to that she developed considerable pain and swelling in the left foot. Since then, the pain continues. The swelling continues. She has color changes in the left foot and nail changes. This presentation is typical for CRPS type 1. I informed her there is no specific test for this condition. Continue with clinical management with pain management, physical therapy amongst others. If symptoms worsen, pain management referral may be considered.

Tr. 383.

Social Security Ruling 03-2P provides guidance for evaluating cases involving CRPS. SSR 03-2P, available at 2003 WL 22399117. The regulation recognizes that CRPS is "a unique

---

[8] A few years earlier, Dr. Ali diagnosed Plaintiff with polyneuropathy. Tr. 382.

clinical syndrome that may develop following trauma. This syndrome is characterized by complaints of intense pain and typically includes signs of autonomic dysfunction." *Id.* at *1. The regulations provide:

> The most common acute clinical manifestations include complaints of intense pain and findings indicative of autonomic dysfunction at the site of the precipitating trauma. . . . It is characteristic of this syndrome that the degree of pain reported is out of proportion to the severity of the injury sustained by the individual. . . . Abnormal sympathetic nervous system function may produce inappropriate or exaggerated neural signals that may be misinterpreted as pain. . . . CRPS patients typically report persistent, burning, aching or searing pain that is initially localized to the site of the injury. The involved area usually has increased sensitivity to touch. The degree of reported pain is often out of proportion to the severity of the precipitating injury.

*Id.* at **2-3.

With the above in mind, the Court turns to Dr. Henderson's May 19, 2015 Comprehensive Neurological Exam of Plaintiff. Dr. Henderson reported Plaintiff could not feel her feet and has to wear slippers. Tr. 339. "She worked as a kindergarten teacher for years and can't get on the floor and kids hit the legs which is painful." Tr. 339. Dr. Henderson noted Plaintiff reported being able to sit for two hours, stand for four minutes, and walk for three minutes. Tr. 340. Dr. Henderson observed "Claimant had to use the back entrance to avoid about ½ flight of stairs and was using a walker." Tr. 340. On examination:

> sensation is painfully hypersensitive to pinwheel, light brush over the legs laterally, diffusely throughout the left foot and diffusely throughout the right foot. The left foot was worse than the right foot and she would withdraw in anticipation of even superficial touch. However during other parts of the test, did not have any hypersensitivity in the left foot while palpating relatively firmly. The left toe had abnormal sensation to vibration and position sense. Right toe had normal sensation to vibration and position sense.

Tr. 341.

Dr. Henderson's exam consisted of a "Comprehensive neurologic exam for diabetes, neuropathy, morbid obesity and hypertension." Tr. 339. Dr. Henderson did not diagnose Plaintiff

with CRPS (as that was beyond the scope of the examination). Dr. Henderson did, however, diagnose Plaintiff with neuropathy, and offered the following opinion:

> However, she gave poor effort during testing, had a significant emotional overlay to the presentation and there were significant discrepancies with sensory testing and purported hypersensitivity. This makes it difficult to confirm the severity of her symptoms and the necessity of a walker. My best guess is that she does not need a walker and should be able to walk normally. Therefore, no restriction for sitting, standing or walking.

Tr. 341.

As with the state agency doctor, Dr. Henderson's opinion is understandable due to the fact he was not looking for any signs or symptoms of CRPD. Dr. Azir's later diagnosis of CRPS, however, necessarily changes how one views both Dr. Henderson's opinion, and the reviewing physician who gave Dr. Henderson's opinion "full weight." After all, the regulations recognize that "It is characteristic of this syndrome that the degree of pain reported is out of proportion to the severity of the injury. . . . CRPS patients typically report persistent, burning, aching or searing pain that is initially localized to the site of the injury. The involved area usually has increased sensitivity to touch." SSR 03-2P at **1-2. When viewed in the appropriate context, Dr. Henderson's opinion that Plaintiff gave poor effort and exhibited "purported hypersensitivity" is explained by the very nature of CRPD.

Where, as here, there exists conflicting medical evidence, the ALJ is charged with determining credibility and resolving any conflicts. *Chaudhry v. Astrue*, 688 F.3d 661, 671 (9th Cir. 2012). As described above, the ALJ erred by not providing a germane reason to reject the opinion of Plaintiff's PA. That opinion was consistent with the record as a whole and, unlike the opinions of Dr. Henderson or the reviewing doctor, was made in light of Plaintiff's CRPS diagnosis. It was error for the ALJ to acknowledge that Plaintiff's CRPS qualified as a severe

impairment, Tr. 18, and then use the syndrome's symptoms and characteristics against Plaintiff in both the credibility determination and in weighing the medical opinions.

As the ALJ erred, the question is whether to remand for further administrative proceedings or an award of benefits. Generally, "when an ALJ's denial of benefits is not supported by the record, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Hill v. Astrue*, 698 F.3d 1153, 1162 (9th Cir. 2012), quoting *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004). However, an award of benefits can be directed "where the record has been fully developed and where further administrative proceedings would serve no useful purpose." *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). Remand for calculation of benefits is only appropriate where the credit-as-true standard has been satisfied, which requires:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Garrison*, 759 F.3d at 1020 (citations omitted).

This is a rare instance where remand for an award of benefits is appropriate. The ALJ erred in rejecting Plaintiff's testimony regarding her symptoms and limitations and in giving no weight to the opinion of Jones, her primary care provider over the course of several years. The opinions relied on by the ALJ in determining Plaintiff could perform light work were provided without the benefit of understanding Plaintiff suffered from CRPS. Taken as true, the rejected evidence establishes Plaintiff is disabled. Jones opined that as of May 2015, Plaintiff's symptoms would cause her to miss more than four days of work each month.[9] Tr. 623. At the hearing, the vocational expert testified that anyone missing more than one day of work each month would not

---
[9] Plaintiff also testified she would miss more than four days of work each month. Tr. 45.

17 – OPINION AND ORDER

be employable. Tr. 50. As Plaintiff could not sustain gainful employment in any job, remand for additional proceedings would serve no useful purpose.

## **CONCLUSION**

The decision of the Commissioner is REVERSED and this matter is REMANDED to the Commissioner for the immediate calculation and payment of benefits.

IT IS SO ORDERED.

DATED this 17th day of March, 2020.

_____/s/ Michael J. McShane_____
Michael McShane
United States District Judge